STROTHER'S ADM'R, &c.

*v.*

STROTHER'S ADM'R, &c.

(*Special Court of Appeals of Virginia, October, 1879.*)

[Virginia Law Journal, 1879, p. 631.]

**Bonds Conditioned to Leave Son One-Half of Estate by Will— Validity of—Case at Bar.**

A. was the only child of J. by his first marriage. On the second marriage of J., A. became displeased and determined to go away from home. J. was devoted to his son A., and by certain promises induced him to remain at home, and A. and J. then made an agreement in the shape of a bond for $10,000, payable to A., his heirs, executors, &c., with the following conditions: That J. should, by his will, give A. one full half of all of his estate of which he should die seized (and should any be conveyed by J. during his life, it should be accounted for in the allotment aforesaid). Should A. die before J., then the same bequest to be made in the manner directed by the will of A. to his heirs, if he should have any; that A. should faithfully discharge the duties of manager of J.'s farm in F. county, Va., for the year 1840, receiving as compensation for his services, one-sixth of the crops, and should, after that period, reside in said county of F. during his own life or that of his father. If J. performed the conditions on his part the bond was to be void, and if A. failed to perform them on his part the bond was to be void. At the time of the execution and delivery of the bond to A., in October, 1839, he was a minor, but became of age the year 1840. A. resided on the farm, superintending it in 1840, and after that resided in the county of F. till his death, which occurred in the lifetime of J., his father. A. married and left four children. J. died in 1864, leaving his second wife and three children. By his will he left one-third of his estate to his wife for life, the residue to be divided into four parts, one to each of her children, and the remaining fourth to the children of A., charging this fourth with any debts he had paid or might

be required to pay for A. By a clause of this will he referred to the paper executed to A in 1839, and said he desired to revoke that paper, and that the terms of the will should be carried out; and that if any claim should be asserted under that paper, the children of A. should have no part of his estate. Much, if not nearly all of the estate was derived through J.'s first wife, the mother of A. On a bill filed by the administrator, with the will annexed of J. to ascertain the respective rights of the distributees of J.'s estate under the bond and will: *held*:

#### Same—Same—Same.

1. Although A., at the time of entering into the agreement with J. in 1839, was a minor, yet, as he came of age in 1840, and elected to and did perform the conditions of the bond on his part, his heirs are entitled to receive one-half of J.'s estate, according to the terms of the bond, subject only to the dower rights of J.'s widow. And any debts paid for A. by J., and intended to be charged as advances, should be so charged against the share to be allotted to his heirs.

#### Case Made Out between Defendants—Decree between.

2. Whenever a case is made out between defendants, by evidence arising from pleadings and proofs between plaintiffs and defendants, a court of equity is entitled to make a decree between the defendants and is bound to do so.

#### Cross-Bills.

3. For some of the doctrines as to when a cross-bill should be required, and a decree for specific performance rendered, see opinion of Barton, J.

From the circuit court of Fauquier county.

The facts of the case are sufficiently stated in the opinion of the court.

*Tucker & Noland* and *Brooke & Scott*, for the appellants.

*E. Hunton* and *J. M. Forbes*, for the appellees.

BARTON, J., delivered the opinion of the court.

Alpheus J. Strother was the only child of John Strother by his first marriage. His father married again. Alpheus

was displeased by this marriage, and at the prospect of other children sharing with him his father's estate, to which he considered himself entitled by reason of his mother's property being its foundation.

He determined to go to Texas to live, and left his father's house for that purpose, refusing to return unless his father would secure him in a certain proportion of his property.

His father, between whom and the son the warmest affection existed, was distressed at the proposed separation, and the idea of his son's emigration to a distant country, then represented to be the scene of much disorder and violence, the dangers of which would be enhanced to the son by his somewhat reckless disposition.    He was induced to return to his father's house by some promise made to him, and an agreement was subsequently arrived at between them, which, under the advice of Wm. F. Randolph, Esq., then a prominent member of the bar, who prepared the instrument, took the shape of a bond for ten thousand dollars, payable to Alpheus, "his heirs, executors, administrators and assigns," with the following condition : "That if the above-named John Strother shall, by his last will and testament, bequeath to the said Alpheus J. Strother, who is his only son, the full one-half of all the property of which he dies possessed, whether real, personal or mixed, and should the said John Strother convey away by deed of gift any portion of his estate, it shall be accounted for in the allotment aforesaid, and should the said Alpheus J. die before the said John Strother, then the same bequest to be made, or in the manner which he may direct, by his last will and testament, to his heirs, if any he should have, and as a further consideration, the said Alpheus J. Strother covenants that he will faithfully discharge the duties of superintendent of the farm of the said John Strother, lying in the county of Fauquier, for and during the year of 1840, receiving as compensation for his services

one-sixth part of all the crops of corn, wheat and oats made on the said farm during the year 1840, and shall, after that period, remain in the county of Fauquier as the place of his residence during his own life and that of his father, the said John Strother.    On a compliance of the foregoing covenant on the part of the said John Strother, then the above obligation to be void; and on the failure to comply on the part of the said Alpheus J., the above obligation is also void, or else to remain in full force and virtue."

This bond was executed and delivered on the 22d October, 1839, to Alpheus, who did superintend his father's farm for the year 1840, receiving the compensation for his services as therein provided.    And did, after that period, continue to reside in the county of Fauquier until his death, which occurred in the lifetime of his father.

He had married in 1840, and left four children, who are parties to this suit.

John Strother died in 1864, leaving his second wife and three children by her surviving him.

By his will he left one-third of his estate to his wife for her life ; the residue to be divided into four parts, one to each of her children, and the remaining fourth to the children of Alpheus, which was to be charged with all the debts he had paid or might thereafter have to pay as surety for him.

The fourth clause of his will, dated 1st February, 1861, is as follows :   "Shortly after my intermarriage with my present wife, I gave to my son, Alpheus J. Strother, a paper writing touching the disposition of part of my estate; the exact purport of that paper I do not now remember, but I desire to revoke the same, and substitute the provisions of this, my will, in lieu thereof, but if any claim upon my estate be established by reason of that paper, then I direct that the children of my said son, Alpheus J. Strother, shall

have no part of my estate, but that the residue of my estate, after the payment of my debts, and the allotment of the one-third part to my wife, shall be equally divided among my children by my present wife."

The widow, who had been nominated as executrix having renounced, the estate was committed to Wm. M. Hume, sheriff, &c., who filed his bill against the widow and children of John Strother and the administrator *de bonis non*, and the children of Alpheus J. Strother, alleging that having notice of the 'paper writing,' as referred to in the 4th clause of his testator's will, but knowing nothing of its provisions or validity, he "is advised that he cannot safely proceed in the settlement of his testator's said estate, unless the said paper shall be produced, and its validity passed upon by some tribunal of competent jurisdiction, and that he is entitled to ask the aid of a court of equity to compel the production of said paper, and to require the parties representing the several estates of said John Strother, deceased, and A. J. Strother, deceased, to interplead touching the same, so that such decree may be made concerning the same as will protect your orator in the discharge of his duties as administrator;" and the prayer of the bill is, that all the parties may be required to answer ; that the administrator of A. J. Strother "may be required to produce the said 'paper writing,' if in his possession or under his control ; that all parties interested therein may be required to interplead before your honor ; that your honor will make such orders, from time to time, as may be lawful and proper to protect the estate of your orator's said testator, and to direct your orator in the proper administration of the same ; that the accounts of your orator may, from time to time, be settled under the supervision of the court," and for general relief.

Mrs. Strother, the widow of John Strother, filed her answer to this bill, as well for herself as her children, whose interests she asked may be protected in like manner as her

own, calls for full proof of the paper, and submits the legal
questions arising upon it, and her husband's will to the court.
Refers to the paper with an accurate statement of its sub-
stance.    Denies that it was upon valuable consideration, or
other than a mere voluntary obligation.    Denies that there
was any valid or binding contract.    And prays "the court
to declare it null, and let the true will of her husband be
carried out."

Lewis, the administrator of A. J. Strother, who had mar-
ried one of his daughters, answered, filing with his answer
the bond, which he had found among the papers of his intes-
tate, averring that Alpheus had fully performed all the con-
ditions on his part; that John Strother, by the terms of his
will, had committed a breach of the conditions of the bond,
and insisting that he had the right to demand payment—that
the consideration upon which it was executed was valuable,
and that it was a valid and subsisting charge upon the estate
of John Strother.

The depositions of many witnesses were taken, and the
cause coming on to be heard on the 22d April, 1868, the
court was of the opinion that the obligation, dated the 22d
October, 1839, was a valid and subsisting obligation upon
the estate of John Strother, performance of which would
be enforced in a court of equity, but that in the then state of
the pleadings no decree for specific relief could be rendered;
retained the cause and gave permission to the defendants, the
heirs at law of Alpheus J. Strother, to file their cross-bill
asking for specific execution of said obligation, and such
relief as they might be entitled to.

The cross-bill was accordingly filed by the heirs at law of
Alpheus J. Strother, to which Mrs. Strother filed her
demurrer and answer; and at the September term, 1868, the
court overruled the demurrer, and appointed commissioners
to divide into two equal parts the real estate of which John

Strother died seized, having reference to quantity and quality, and to allot one of the moieties to the heirs at law of Alpheus J. Strother, and make report to the court; and a further order of inquiry as to the property held by John Strother at his death.

The widow of John Strother and her children obtained an appeal to the district court at Fredericksburg, which has been transferred to this court.

The circuit court considered this a case for specific performance. If that view were correct, the cross-bill was indispensable; for no such claim had been then made on behalf of Alpheus J. Strother's estate, and no such issue had been presented by the pleadings. The cross-bill would, therefore, have been necessary as a foundation for such decree. I do not consider this a case for technical specific performance. The contract is not for any property in specie, but only for gross value. It is for the full half of all, whether real, personal or mixed. One-half in value would fulfill the contract. A bequest of a certain amount in money, which proved to be equal to the value of one-half of John Strother's estate, would have satisfied the condition of the bond. Alpheus could not claim the one-half of any particular piece of property, whether it was real, personal or mixed, but only the value of one-half of all, which is a mere claim for money. So far, then, as the cross-bill was required to present that question to the court, it is deemed to have been unnecessary.

Nor is it considered to have been required for any other purpose. The object of such a bill—not being also for discovery—is "to obtain full relief to all parties touching the matters of the original bill." Story's Eq. Pl. § 389.

Under the frame of the original bill in this case, a cross-bill was unnecessary for full relief as between the plaintiff, and the administrator, and heirs at law of Alpheus J. Strother.

President Tucker in Hubbard v. Goodwin, 3 Leigh 522, thus refers to the subject of decrees between co-defendants :

"A defendant, who answers the plaintiff's bill, does not always go on to state his own case as it relates to the difference between him and his co-defendant. There is no issue made up, nor any provision for taking their testimony in reference to the peculiar matters in controversy between them. And hence, in many cases, the contest between them cannot come fairly before the court.''

In a case where the defendants had stated the case fully as it related to the difference between themselves, when, as here, that difference was the very subject of controversy in the case—when the issue was made up, and the testimony taken, so that the case did come fairly before the court, it would follow, by necessary implication, that the court should proceed to decree between the co-defendants without requiring a cross-bill.

And accordingly we find the note laid down by Lords Eldon and Redesdale before the House of Lords, in Chamly and Lord Dunsang et al., 2 Sch. & Lef. 718, cited by Judge Allen in M. Blair v. Thompson, 11 Gratt. 446, as follows :

"Whenever a case is made out between defendants, by evidence arising from pleadings and proofs between plaintiffs and defendants, a court of equity is entitled to make a decree between the defendants, and is bound to do so.''

In the case at bar, the defendants have mutually stated the case in respect to the difference between them ; the issue was made up ; the testimony taken on their respective behalf ; indeed, all was taken prior to filing the cross-bill, except a merely formal proof of handwriting. And the case was fairly and fully before the court, without any objection on either side, that there was any defect in pleadings or proofs, or that the case was not ready for hearing as to their respective claims.

And there is here the less occasion for a cross-bill, from the fact, that the original bill, if not a technical bill of interpleader, is in the nature of a bill of interpleader, and is in terms a bill filed by an administrator *de bonis non*, "to obtain the direction of the court upon the adverse claims of different defendants," which, of itself, and without any cross-bill, "puts the defendants to contest their respective claims." See 3 Danl., Ch. Pr. 1765.

It seems, therefore, in this case, unnecessary to consider the cross-bill, or many of the questions arising under it, however interesting they may be from the learning and ability with which they have been discussed on both sides.

It is contended by the counsel for the appellants, that the considerations expressed in the bond in the form of conditions to be performed by Alpheus do not constitute valuable consideration on his part, because, as to the condition that he should superintend his father's farm for the year 1840 ; that he was not of age when the agreement was made, and was therefore incapable of binding himself ; that he was under the legal control of his father, who was entitled to his services until his arrival at full age ; and that those services, therefore, furnished no consideration for any agreement on the part of the father ; and as to the condition of his continued residence in the county of Fauquier, that it did not of itself constitute valuable consideration.

If Alpheus was not of full age when the bond was executed, he certainly became so during the year 1840. And after his arrival at age continued to act as his father's manager for the rest of the year, and to reside in the county of Fauquier during the remainder of his life.

In the absence of proof to the contrary, presumption of law would be, that the acts of performance on his part related to the conditions he was required to perform. The burden of proof lies on the other side to show that they were

to be ascribed to some other cause.    No such proof is offered. On the contrary, it appears from the bond, independently of the legal presumption from his performance of the conditions after his arrival at age, that he did ratify and elect to hold his father to his obligation.    By this election the father was bound equally as if Alpheus had been of full age when it was originally made.    3 Rob. Pr. (new), p. 221, and authorities there cited.

While I think it could be shown by reason and on authority, that the services rendered by Alpheus, and his continued residence in the county of Fauquier would constitute valuable consideration, I do not deem it necessary to discuss the point, as in the view which I take of the case, it is not material, however important it might be, if this were a case of specific performance appealing to the discretionary power of the court.

Suppose this bond is to be considered, as is contended for the appellants, as made without valuable consideration, to be a mere voluntary obligation.    Such obligation is good and valid between the parties, and constitutes a debt due by the obligor to the obligee.

By our statutes prescribing the order in which the debts of a decedent shall be paid, voluntary obligations are put in the last class.    But they are classed as debts to be paid out of the state ; which is bound for their payment, both realty and personalty, before an heir or devisee can claim.    Code of 1860, chap. 130, sec. 25 ; 131, sec. 3.

If this were a single bill for the payment of ten thousand dollars at the death of the obligor, it cannot be denied that the administrator of the obligee would be entitled to recover the whole amount.

If the only conditions were that Alpheus should act as his father's manager for the year 1840, for the stipulated compensation, and should afterwards continue his residence in

the county of Fauquier during their joint lives, and
Alpheus had performed these conditions, the result would be
the same, without regard to the question whether the con-
ditions separately or jointly amounted to valuable considera-
tion.

If, in additon to the conditions to be performed by the
obligee there was the further condition that the obligation
should be discharged by the payment of a certain amount,
the rights of the obligee, upon his performance of the condi-
tions imposed upon him, would only be varied, so as to
enable him to claim, instead of the full amount of the bond,
that amount only by which it was provided that the bond
might be discharged.   That amount need not be stated in
express words ;  it would be sufficient that it was so expressed
as to be capable of being ascertained.

I consider it the true construction and legal intendment of
the condition to be performed by John Strother in discharge
of the bond, that the obligation was to be discharged by the
payment, at the death of the obligor in the manner pro-
vided, of so much as would be equal to the value of one-half
of the estate, which he had the right to dispose of by will.
And thus the obligee would only be entitled to that amount,
which could be readily determined by simple calculation,
when the value of the estate was ascertained.

In an action of debt on this bond, the judgment would be
for the ten thousand dollars, to be discharged by the pay-
ment of this amount, which had been ascertained.

It might be necessary to go into a court of equity to obtain
a discovery of the estate, and to have the administration
account settled so as to ascertain the amount of the estate.
If so, the court would, as auxiliary to that jurisdiction, pro-
ceed to administer full relief, according to the legal rights
of the parties.

In this case, the appellees did not seek the aid of a court of equity as plaintiffs. They were brought into court by the personal representative of John Strother. He acted prudently and rightly in so doing. Why should the parties now be required to go into a court of law to establish their legal rights, when the whole subject matter is within the jurisdiction of the court of equity—and to which resort would be finally necessary to enforce these rights.

It is only in the court of equity that the administration account could be settled, and the real assets subjected to the payment of debts. And its jurisdiction is the usual and far more convenient one for ascertaining the amount and value of the estate, and the allotment of the widow's dower. It would be contrary to all settled rules and the uniform practice of the court were it to fail, having all the parties before it, and full jurisdiction over the subject matter, to proceed to adjust the rights of all the parties, whether they be legal or equitable.

The objection to the court of equity proceeding in this case to administer full relief, is based upon the idea, that equity will not interfere in favor of a volunteer. But as was said by Vice-Chancellor Wigram, in Fletcher v. Fletcher, 4 Hare 74 (36 Eng. Ch. Rep.), "That proposition, though true in many cases, has been too largely stated. A court of equity, for example, will not, in favor of a volunteer, enforce the performance of a contract in specie. That it will, however, sometimes act in favor of a volunteer, is proved by the common case of a volunteer on a bond, who may prove his bond against the assets;" exactly what is desired in this case. Again on page 76, "The rule against volunteers cannot, I conceive, in a case like that before me, be stated higher than this—that a court of equity will not, in favor of a volunteer, give to a deed any effect beyond what the law will give to it. But if the author of the deed has subjected himself to a lia-

bility at law, and the legal liability comes regularly to be enforced in equity, as in the cases before referred to, the observation that the claimant is a volunteer is of no value in favor of those who represent the author of the deed.''

The case of Fletcher v. Fletcher was this : Ellis Fletcher by a voluntary deed covenanted with trustees that in case John and Jacob, his two natural sons, or either of them should survive him, his executors and administrators should within twelve months after his death pay to the trustees $60,000 upon trust for such of them (John and Jacob) as should attain twenty-one, and be living at the time of his death. And if neither of them having survived him should attain the age of twenty-one, then upon trust for him, his executors, &c. By his will, dated some years after the deed, he bequeathed all his property upon trust for the benefit of his wife, his two natural sons, and three legitimate children. John died an infant. Jacob became of age in 1862. The trustees named in the deed declined to take any steps to enforce it, either at law or in equity, or to permit their names to be used, except under decree of the court, and being indemnified, and declined the trust. The executor admitted assets. Upon a bill filed by Jacob, it was held, that although the deed was voluntary, it was perfect. That the covenantor was liable at law, and the court was not called upon to do any act to protect it. And no reason being given for trying the case at law, it was retained in the court of equity, and a decree was entered for the amount.

This case goes further than is necessary to support the full jurisdiction of the court of equity in the case before us.

I think, then, that even admitting this bond to be without valuable consideration, and merely voluntary, the case coming before the court in its ordinary jurisdiction *ex debito justitiæ*, and not appealing to its discretionary powers, it should

be retained, and full relief administered according to the legal rights of the parties.

The circuit court, by its decree, appointed commissioners to lay off the moiety of the land of which John Strother died seized for the children of Alpheus, without any regard to the dower rights of John Strother's widow.

This was error, even if it were a case of specific execution. For by the very terms of the condition, Alpheus could, in no event, claim more than one-half of what John Strother could dispose of by his will.    He could not interfere with the widow's dower.    She held by title paramount.    And it is only in what remains, after satisfying her rights, that those representing Alpheus have any interest.

John Strother, in his will, refers to debts he had paid, and might have to pay as surety for Alpheus.    And there is evidence in the record of such payments.    These debts due by Alpheus would constitute a part of the testator's estate, and would go to swell the amount, to the one-half of which those representing Alpheus would be entitled.    But the amount of those debts should be charged against that share as being advances already made by the testator on account, as should also any other sums paid to or for Alpheus, which may be proved to have been intended as advances on account of the obligation.

I think, therefore, that the decree should be reversed, and the cause remanded for further proceedings.

WINGFIELD, P., and McLAUGHLIN, J., concurred.

Decree reversed.